No. 100,076

STATE OF KANSAS, *Appellee*, v. JOSHUA L. STONE, *Appellant*.

(237 P.3d 1229)

Opinion filed August 20, 2010.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Boyd K. Isherwood*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Joshua Stone was convicted of one count of aggravated indecent liberties with a child. On appeal, he argues that the prosecutor's remarks during closing argument amounted to prosecutorial misconduct denying him a fair trial. He also argues that

a tape recording of his interrogation should not have been admitted into evidence.

Stone was tried on one count of aggravated indecent solicitation of a child; two counts of aggravated indecent liberties with a child, one of which alleged that he lewdly touched the victim and the other of which alleged that he submitted to her touching; and one count of criminal threat. The victim, 9-year-old A.L., spent the night of December 19, 2006, at the apartment of her mother's cousin. Stone is the cousin's stepbrother and he was temporarily living there. A.L.'s mother and Stone had briefly been in a relationship so he and A.L. knew each other. A.L. alleged that Stone woke her up, took her into the living room where he slept on a futon sofa, instructed her to masturbate him, put his hand on her "crotch," and then threatened to kill her if she told anyone.

The next day, A.L. did tell a 17-year-old babysitter. The babysitter told Stone's stepsister and A.L.'s mother who, after first attempting to take matters into their own hands, called the police. As a result, Stone was picked up by the Wichita police and interrogated by Detective Kelly Mar. The interrogation began at approximately 1 a.m. and was recorded (audio only). It lasted a total of about 1 hour and 40 minutes, consisting of two segments. During the first, Stone's personal history information was collected, he was read and waived his *Miranda* rights, and he agreed to give a DNA sample. The second 85-minute segment consisted of his interrogation by Detective Mar. The intervening break was caused by the detective turning off the recording machine while she swabbed Stone for the DNA sample. A redacted version of the recording was played for the jury members, who were also allowed to follow along on a transcript. Stone maintained his innocence throughout the interview; however, after he initially denied that anything happened, his account of the incident gradually expanded as the interview progressed. Eventually, he made some incriminating statements, including that the victim put her hand on his penis.

Prior to interviewing Stone, Detective Mar had interviewed A.L. That interview was videotaped and the video was played for the jury in its entirety. The video was not included in the record on appeal, but the audio portion of the interview was. A.L. reported

to Detective Mar that, during the event, sticky stuff came out of Stone's penis and she wiped it on her pajama top. Despite not having the results of lab tests on the pajama top, Detective Mar repeatedly told Stone during his interrogation that semen had been found on the pajama top and he needed to explain how it got there. In fact, when lab results were complete, no semen was detected on the pajama top.

The prosecutor opened her closing argument with the statement, "[A.L.] told you what happened." She closed her summation with the statement, "[A.L.] told you what happened. She showed you what happened. She is a credible witness." During the course of her closing argument, she also told the jury:

> "He [Stone] has two huge obstacles he has to overcome to present any kind of a credible defense to you. The first obstacle that he has to overcome is that [A.L.] is so credible.
>
> . . . .
>
> "The other huge obstacle the defendant has to overcome is his confession."

The jury had deliberated for approximately a day before asking the court to view again the videotaped interview of A.L. and to hear again portions of the tape recording of the interrogation of Stone and the entire testimony of A.L. The jury wanted to hear the portions of the interrogation "when the detective began telling the defendant he had semen on [A.L.]'s shirt, when the detective and Mr. Stone began talking about [A.L.] actually touching him, one finger, two fingers and approximately the last quarter of the interview." The trial court and attorneys determined that identifying specific portions of Stone's interview on the tape was too difficult and that the entire interrogation should be played again for the jury. The jury's two other requests were also granted.

After deliberating approximately 3 more hours, the jury informed the judge that it was hopelessly deadlocked. The trial judge instructed the jury to return to the jury room to ensure that it could not reach a verdict. According to the times noted in the transcripts, 2 minutes later it returned with a guilty verdict on one count of aggravated indecent liberties with a child and not guilty verdicts on the remaining charges.

The trial court departed from the mandatory 25-year sentence under K.S.A. 21-4643, "Jessica's Law," and sentenced Stone to 61 months. Stone appealed. Jurisdiction is in this court under K.S.A. 22-3601(b)(1), conviction of an off-grid crime.

PROSECUTOR'S CONDUCT

Stone complains that statements made by the prosecutor during closing argument entailed improper comment on the credibility of witnesses and shifted the burden of proof in the case to him, denying him a fair trial. He made no objection to the comments during the closing argument, but a contemporaneous objection to prosecutorial misconduct during closing argument is not required in order to preserve the issue for appeal. *State v. McReynolds*, 288 Kan. 318, 322-23, 202 P.3d 658 (2009); *State v. Albright*, 283 Kan. 418, 428, 153 P.3d 497 (2007).

"In general, appellate review of an allegation of prosecutorial misconduct involving improper comments to the jury follows a two-step analysis. First, the appellate court decides whether the comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. Second, the appellate court decides whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Albright*, 283 Kan. at 428.

"In the second step of the two-step analysis, the appellate court considers three factors: '(1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually controlling. Moreover, the third factor may not override the first two factors unless the harmless error tests of both K.S.A. 60-261 [refusal to grant new trial is inconsistent with substantial justice] and *Chapman v. California*, 386 U.S. 18, [22,] 17 L. Ed. 2d 705, 87 S. Ct. 824, *reh. denied* 386 U.S. 987 (1967) [conclusion beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial], have been met. [Citations omitted.]' *Albright*, 283 Kan. at 428." *McReynolds*, 288 Kan. at 323.

Stone argues that the State's closing was improper for a combination of three reasons. First, he argues that the State improperly attempted to shift the burden of proof by arguing that he had significant "obstacles to overcome." He combines the second and third reasons into one argument that the State improperly com-

mented on the credibility of the complaining witness by asking the jury to speculate on matters not in evidence when it argued that her version was credible because if she had made up a story, she would have made up a better one than the one she gave.

*Shifting the Burden*

It is improper for the prosecutor to attempt to shift the burden of proof to the defendant or to misstate the legal standard of the burden of proof. See *State v. Tosh*, 278 Kan. 83, 89-92, 91 P.3d 1204 (2004). In *Tosh*, a rape case, the prosecutor questioned the jury in closing argument, " ' "[I]s there any evidence that it didn't happen? Is there any evidence that the things she told you didn't happen?" ' " 278 Kan. at 92. This court found the questions an impermissible attempt by the State to shift the burden of proof to the defendant. 278 Kan. at 92.

In this case, Stone contends that the State's argument that he had "obstacles to overcome" amounted to the same kind of burden-shifting argument that occurred in *Tosh*. The statements here, however, seem more akin to those made by the same prosecutor in *State v. Burden*, 30 Kan. App. 2d 690, 46 P.3d 570 (2002), *rev'd on other grounds* 275 Kan. 934, 69 P.3d 1120 (2003). There, the Court of Appeals, in a decision written by Judge (now Justice) Beier, considered the prosecutor's remarks in closing argument, " '[T]he most overwhelming thing that the defense cannot overcome in this case is the physical evidence that corroborates [the victim's] initial statements.' " 30 Kan. App. 2d at 703. The court characterized the comment as "inartful" but noted that the jury was properly instructed on the burden of proof and concluded that "the prosecutor was not attempting to shift the burden of proof to the defendant. Rather, she was within the considerable latitude granted to prosecutors to comment on the weakness of defenses . . . ." 30 Kan. App. 2d at 703.

Here, the prosecutor spent time in her argument reviewing the burden of proof instruction with the jury.

"I want to go over some of the legal things with you. You know, the jury instructions are the factors that you get of how to decide the case, and the first one that I'll talk about is the burden of proof. These elements of the offenses that the

judge has just read, those are the things that must be proven beyond a reasonable doubt, those elements and only those elements."

Later in the argument, the prosecutor reviewed the instructions listing the specific elements that must be proven beyond a reasonable doubt. This argument stands in contrast to the argumentative questions posed to the jury by the prosecutor in *Tosh,* implying that it was the defendant's burden to produce evidence to disprove the charges.

*Credibility of Witness*

"In general, prosecutors may not offer juries their personal opinions as to the credibility of witnesses. Prosecutors have wide latitude, however, to craft arguments that include reasonable inferences to be drawn from the evidence. That latitude includes explaining to juries what they should look for in assessing witness credibility, especially when the defense has attacked the credibility of the State's witnesses. *State v. Scaife*, 286 Kan. 614, 623-24, 186 P.3d 755 (2008)." *McReynolds*, 288 Kan. at 325.

"The point of not allowing a prosecutor to comment on the credibility of a witness *is that expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony*, not *commentary on the evidence of the case*." *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 (2000).

Clearly, a few of the prosecutor's statements, taken in isolation, constitute questionable prosecutorial argument. Her unqualified assertion that "A.L. told [the jury] what happened," and "[s]he is a credible witness," standing alone, were undeniably commentary on the credibility of her witness. But these comments were the brackets around an argument that detailed for the jury the factors that it could and should consider in determining the credibility of the witness. This argument included:

"How do you assess the credibility of the witnesses? The legal instructions tell you you have the right to determine a witness' credibility about the subject a witness testifies about. You have a right to use your common knowledge and experience, so look at yourself. You are men and women. You are different ages. You have different occupations, moms, dads, whatever your occupations.

"How do you assess the credibility of people that you deal with every single day? By eye contact, by the words that they use and what they are saying, by the context of the situation and how they are describing things. Use this law and you will find—talk about how credible [A.L.] is compared to him."

Placed in context, the prosecutor's statements on credibility appear to be her attempt to summarize the conclusion to which an assessment of the evidence would lead the jury, rather than unqualified assertions that the jury should simply believe the prosecutor's own assessment of the witness.

The prosecutor's statements in this case continue to be "inartful" but within the wide latitude allowed the State when discussing the evidence in closing argument. Even if the court were to conclude that some or all of the comments were outside the latitude allowed the prosecution, they do not require reversal under the second part of the prosecutorial misconduct analysis. The conduct was not gross and flagrant, nor did it demonstrate ill will on the part of the prosecutor. It must be noted, however, that the third factor of this analytical step, "whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors," gives pause. Clearly, the jury in this case did not find the evidence to be overwhelming. The trial judge recognized and commented on that fact in imposing a departure sentence on Stone. Nonetheless, the prosecutor's comments in closing were not so egregious as to warrant a conclusion that a new trial is required.

### Stone's Interview Statements

Detective Mar's interrogation of Stone was recorded (audio only) and a transcript of the recording was created. On October 5, 2007, the trial court conducted a *Jackson v. Denno* hearing to determine whether the recording and transcript would be admissible at trial. See *Jackson v. Denno*, 378 U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774 (1964). The trial judge listened to the testimony of Detective Mar, as well as to the entire recording, with the benefit of the transcript to follow as he listened. At the conclusion of the hearing, he found the statements Stone made to the detective during the interview were made with a full understanding of his rights and were voluntarily given. Ultimately, the jury heard a redacted version of the recording twice and was allowed to follow along on a redacted version of the transcript. Stone argues the recording and transcript should not have been admitted into evidence.

A dual standard is used when reviewing the suppression of a defendant's statements. In reviewing a trial court's ruling on a suppression issue, the appellate court reviews the factual underpinnings of the decision under a substantial competent evidence standard. The ultimate legal conclusion drawn from those facts is reviewed de novo. The appellate court does not reweigh evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *State v. Gant*, 288 Kan. 76, 80, 201 P.3d 673 (2009); *State v. Johnson*, 286 Kan. 824, 835-36, 190 P.3d 207 (2008).

When a defendant claims his or her statement was not voluntary, the prosecution has the burden of proving by a preponderance of the evidence that it was voluntary. The essential inquiry is whether the statement was the product of an accused's free and independent will. The court looks at the totality of the circumstances surrounding the statement and determines its voluntariness by considering the following nonexclusive list of factors: " '(1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language.' [Citation omitted.]" *Johnson*, 286 Kan. at 836. We have recognized that law enforcement coercion can be mental or physical. *State v. Jackson*, 280 Kan. 16, 36, 118 P.3d 1238, *cert. denied* 546 U.S. 1184 (2006).

K.S.A. 60-460(f) also governs the admissibility of confessions or statements by the accused:

> "In a criminal proceeding as against the accused, a previous statement by the accused relative to the offense charged [is admissible], but only if the judge finds that the accused (1) when making the statement was conscious and was capable of understanding what the accused said and did and (2) was not induced to make the statement (A) under compulsion or by infliction or threats of infliction of suffering upon the accused or another, or by prolonged interrogation under such circumstances as to render the statement involuntary or (B) by threats or promises concerning action to be taken by a public official with reference to the crime, likely to cause the accused to make such a statement falsely, and made by a person whom the accused reasonably believed to have the power or authority to execute the same."

Stone argues that his lack of experience with law enforcement and the late hour of the interrogation, combined with promises and deceptive practices by Detective Mar, rendered his statements involuntary and not a product of his free and independent will.

Following the hearing, the trial judge made extensive findings on the record on each of the six voluntariness factors set out above. He found there was no question regarding Stone's ability to understand English and no reason to suggest that Stone's age, 23, or his intellect or background presented an obstacle to his understanding of the interrogation proceedings. Stone has not argued that they did, nor have we uncovered any reason to suspect those factors affected his statements.

Next the district judge reviewed the manner and duration of the interrogation. He observed that at times the questions were tough or aggressive but did not find the tone of the interrogation to be anything out of the ordinary. Nor did the length of the interrogation, a little over 2 hours, present a problem of undue duress. He also found that Stone made no requests to communicate with anyone outside of the interrogation and, consequently, that factor simply did not apply. Again, Stone has not argued these issues, and the tape recording of the interrogation supports the district court's findings.

The district court next considered Stone's mental condition at the time of the interrogation. Stone argues that he was tired and confused due to the late hour of the event, but the district court found that Stone had no difficulty in understanding and responding to the detective's questions. The district court believed that Stone's claims of exhaustion or confusion only correlated with tough questions by the detective but, in fact, Stone repeatedly stated during the interview that he was tired. He mentioned having worked 100 hours at his fast food job over the preceding 2 weeks, having a sore throat, and having recently been to the hospital for an ankle injury. He told the detective early in the interview that he becomes confused when under pressure, and this claim was born out by the recording and transcript. His responses to the detective's questions were often disorganized and garbled. He cried several times during

the interrogation and became audibly frustrated with the detective's repeated questioning.

The district court then reviewed the tactics used by Detective Mar during the interrogation. Stone argues that Mar used deceptive tactics to confuse him and pressure him into making incriminating statements. Specifically, the district court reviewed three tactics used by Mar: insisting that Stone tell her "the truth," telling Stone that he needed to appear cooperative to the prosecutor and the judge, and lying to Stone about the presence of his semen on the victim's pajama top.

Repeatedly throughout the interrogation, Detective Mar exhorted Stone to tell the truth or told him she was "just trying to get the truth." In context, it is clear that Detective Mar was accusing Stone of lying when he repeatedly denied the accusations against him and that "the truth," from the detective's perspective, was the victim's version of the events. She combined this tactic with repeatedly telling Stone that she had confirmed the presence of semen on the victim's pajama top and she was just trying to figure out how Stone's semen got on the pajama top. While she did tell him that she had not yet matched DNA from the pajamas to his DNA, it is clear from her statements that she had little, if any, doubt that the two would match. In fact, she told Stone that she believed they would match. She combined these two tactics with statements inferring that only confessing to the crime would affect whether Stone went to jail or the length of his jail sentence.

The trial judge reviewed each of the three alleged deceptive practices individually, citing case law to support his conclusion that each did not render Stone's statements involuntary. With respect to the allegation that Mar unduly pressured Stone by repeatedly insisting that he tell the truth, the court cited *State v. Newfield*, 229 Kan. 347, 623 P.2d 1349 (1981), for authority that encouraging the defendant to tell the truth is not inappropriate. In *Newfield*, the issue was whether the defendant's statement should be suppressed because he had invoked his right to counsel but had then confessed before counsel was appointed or present. The interrogating officer in that case told Newfield that the people of the town would think better of him if Newfield told the truth. *Newfield* re-

cites the well-worn rule that a "mere exhortation or adjuration to speak the truth, or the mere suggestion to an accused that he confess, will not exclude a confession. [Citations omitted.]" 229 Kan. at 359. But this rule was not essential to the decision in *Newfield*, and the facts of the case are not similar to those presented here. The issue in *Newfield* was more precisely whether the statement that the town would think better of the defendant if he confessed carried an implied promise. There was no indication in *Newfield* that the officers attempted to pressure Newfield into talking by repeatedly insisting that he explain away nonexistent evidence as happened in this case. In this case, Mar's repeated exhortations to Stone to tell the truth, combined with her insistence that Stone's semen was on the victim's pajamas and that she needed an explanation for that, created considerable pressure on Stone to come up with an explanation.

Next the trial court considered whether Detective Mar had made any promises to Stone that would render his statements involuntary. The court focused on only one statement in which Detective Mar told Stone:

> "KM: [W]hy don't you think about what is—what is the judge and the [district attorney] gonna think about how—how you can step up and be honest and tell the truth. That you can be a man and step up and tell the truth. That speaks volumes. That's—that's [unintelligible] important that has an opinion of you. Step up and be a man and tell the truth."

The judge cites *State v. Altum*, 262 Kan. 733, 941 P.2d 1348 (1997), and *State v. Johnson*, 253 Kan. 75, 853 P.2d 34 (1993), as authority for his finding that this statement was not unduly coercive and did not render Stone's statements involuntary. Standing alone, the statement approximates the statements at issue in both *Altum* (detective told Altum if he stuck to his story, he was going to look foolish in court and the detective was not going to be able to tell the judge or the jury that he cooperated in the investigation) and *Johnson* (detective told Johnson he could not make any deals, he could only go to the prosecutor and indicate whether Johnson was cooperating). We would agree with the trial court's findings if there were nothing more in the transcript to question, but that is not the case as we will demonstrate shortly.

Finally, the trial court considered the repeated statements by Detective Mar that there was semen on the pajama top and her implications that the DNA sample taken from Stone would match the DNA that would be pulled from the clothing. The trial court notes that a "big part of the interview was the inference or assumption by both the interrogator and Mr. Stone that there was semen on the clothes of the victim and that the semen was available to be tested and analyzed. " In fact the substance on the pajama top could not be confirmed to be semen, much less be matched to Stone.

The trial judge reviewed *State v. Wakefield*, 267 Kan. 116, 977 P.2d 941 (1999), and found that it stands for the rule that deceptive interrogation techniques do not establish coercion but are one circumstance that must be viewed in conjunction with the others present to assess the totality of the circumstances surrounding Stone's statements and their effect on its voluntariness. Nonetheless, the district judge seems to conclude that since Detective Mar sincerely believed that there was semen on the clothing, this tactic could not be found to be unduly coercive.

The trial judge considered each of these interrogation techniques individually, but there is no indication in the record that he considered the cumulative effect of these techniques when taken as a whole, and it is in this regard that we believe the trial court's review was lacking. A review of the recording and transcript establishes that the combined effect was significant.

Shortly after the second part of the interview began, Detective Mar began asking Stone to explain how his semen could have ended up on A.L.'s pajama top.

"KM: Okay, so, would there be any reason why she would have any of your DNA on her?
"JS: Uh huh (neg.).
"KM: Would there be any way that any of your semen would be on her or on her clothing?
"JS: No.
"KM: So, if I found semen on her clothing that she was wearing last night, no chance it's yours?
"JS: No.
"KM: Okay. Any idea how she'd get semen on her clothing?

"J.S: But I wouldn't do it. I know huh—never mind, I'm to[o] tired to think.
"KM: I mean, would you know of any[ ]way that she's [*sic*] have semen on her clothing?
"JS: No. Cause I know I wouldn't do nothing like this.
"KM: Okay.
"JS: I don't know how many times I have to sit here and say this.
"KM: Well, I'm—I'm just trying to figure out what happened. I mean it's not like—
"JS: I'm getting wrongly accused that's what it's getting down to the point.
"KM: Okay.
"JS: I'm getting wrongly accused of it. I'm tired."

As the interview continued, Mar continued to press for an explanation of how Stone's semen could be on A.L.'s pajama top. Stone continued to deny wrongdoing and even told the detective that it did not matter what he said, that she was apparently going to say he did it regardless of what he said.

"JS: And I'm tired of it. I don't want to be accused of stuff anymore.
"KM: Okay. So why would she tell me this story?
"JS: Where is this leading to?
"KM: Well, I'm trying to figure out, okay, it's leading to I've got clothing that has semen on it. Okay. I had a lab out at the house and they [luminoled] have you ever seen that where they [luminol] a couch and then black light it? And if there's semen there it shows up. And they found semen on the futon. Okay. I have clothing that we [luminoled] and I have semen on that clothing. Okay. And I'm gonna match, I'm gonna run that semen with your DNA that I collected tonight through the lab. Now, what I'm asking you is am I gonna get a match?
"JS: But see thing is I would not do nothing, I would not have nothing like that on the clothing. And I did not do nothing with her.
"KM: Okay. So, you're saying that—that no way what happened what she's saying happened happened last night?
"JS: Not even half of it.
"KM: Okay. So, am I gonna get a match?
"JS: ____ if you do ____ you do ____ because you know—
"KM: Okay. So, if I do—
"JS: [I]f you guys are going to do something—
"KM: —what I'm asking you, is explain to me Josh, how would your semen show up on her clothing?
"JS: I did not do have her do nothing to me.
"KM: Okay. So, how—how is it that—that—that she's got semen on her clothing? I mean there's no doubt that's what it is. Okay.
"JS: __________.

"KM: Cause we've already confirmed that—that's what it is. Now, we're just gonna do the DNA pull the DNA from it ________."

Shortly after this point, Detective Mar told Stone that "we need to get you some help. We need to get you some counseling." Stone began asking her how confessing to the crime was going to help him. He claimed he was being wrongly accused. Stone can be heard crying on the tape and then told the detective that A.L. did get up in the night and came over to the futon where he was sleeping to give him a hug. He said her hand rubbed up against him and he pushed it away, but he continued to maintain that he did not have her do anything to him. The detective repeated the victim's story and continued to question why Stone's version did not match the victim's. She continued to press him to tell her what happened. Stone responded:

"JS: How many times do I have to tell you on this recorder that I—that I got woke up and I was half asleep while I was sitting up and she bent over and gave me a hug.

"KM: Okay.

"JS: How many times I got to tell you that story?

"KM: But that's not answering my question. When I said—

"JS: How's that not answering your question.

"KM: I'm asking you are you saying that what she's telling us is just a big story?

"JS: I would not have a little girl touch me.

"KM: Okay. Is [A.L.] telling us a story?

"JS: I don't know ________ I don't know.

"KM: No, I don't believe she is. I think she's telling us the truth. Because she's very precise about it and—and you know, I asked you to tell the story the same and your story changes. Her story ________ and she's told ________.

"JS: Cause my nerves are shot through the roof, okay?

. . . .

"KM: You're telling me that a nine year old [girl's] two little tiny fingers slipped down your pants and grazed your penis and got a big gloop of semen.

"JS: Basically, what you're telling me is that I did do it.

"KM: I'm telling that that's exactly what happened. . . . And I, I'm pretty—I'm pretty sure that she's telling me is the truth. *And I also know that when I match the DNA off the couch and off her shirt with the DNA from your mouth, it's all gonna match. All of it. Because she's telling me the truth. So now, I'm just asking you to tell me the truth. Help yourself. It's gonna help you because it's gonna show that you're not, you didn't prey on her."* (Emphasis added.)

The interrogation continued in this manner, with the detective telling Stone to "just tell the truth" and Stone becoming increasingly frustrated and maintaining that he believed he would be in trouble whether he told the truth or not.

"KM: So, she's lying? You're telling me she's lying?
"JS: How—how is to me every time I tell the truth that I know that I if that even if I do say the truth then my ass ain't gonna go to jail how would that help her.
"KM: Because you messed her mind up. She ____ she trusted you. You're an adult. Okay. It's gonna be helpful for her if we can tell her, you know what? He made a mistake. He ____.
"JS: How is that going to cause me to go and get help too.
"KM: How, is not gonna help you to know that you've told the truth and that you've, you know, that look at what happened.
"JS: How is that gonna keep me out of jail?"
"KM: Huh? *Nothing is going to keep you at this moment out of jail unless we can figure out what's the truth. What is the truth. I've asked you. Is she lying? And you can't answer that, because you know she's not lying.*

. . . .

"JS: But how but what I want to know ma'am is why ____ telling the truth ____ get help when it's gonna send me straight to where.
"KM: So, Josh, what you been telling me tonight's been a lie?"
"JS: No, but—not all of it.
"KM: Well, I believe the part where you're sitting up is the truth.
"JS: But why, but why, but I wouldn't have little girl touching me on my—
"KM: I don't think, I don't think that you do that on normal basis. I *think* last night you made a bad choice.
"JS: ____ but—
"KM: Okay, You made a bad choice. So, you know what you step up and you take punishment for being, making a bad choice, just like you ____.
"JS: How long I'm going to be in? (crying)
"KM: I don't know. *Depends on how much you're willing to be honest about.*" (Emphasis added.)

Shortly after this point in the interrogation, Mar told Stone to think about what the judge and the prosecutor would think. Although he continued to deny that he had A.L. do anything to him, he then told the detective that A.L. grabbed his penis and squeezed it.

"KM: Okay. So, she reached down and—
"JS: Yes, ma'am.
"KM: —took a hold of your penis?

"JS: Yes, ma'am.
"KM: Okay. And having somebody holding your penis and she was moving up and down cause she's made that motion hand motion with her hand, she was moving up and down on your penis wasn't she?
"JS: Yes, she was.
"KM: Okay.
"JS: But I didn't have her do it."

Stone told Detective Mar that the touching lasted approximately 3 minutes during which he told A.L. to stop. These turn out to be the most incriminating statements that Stone made. Shortly after he made them, the detective terminated the interview.

As stated earlier, a dual standard of review applies to our review of the trial judge's decision. First, we examine whether substantial competent evidence supports his findings. In this case, substantial competence evidence does underlie most of his factual findings, although the trial judge ignored the more egregious statements made by the detective during the interrogation. Second, we review de novo the ultimate legal conclusion made by the trial judge. It is on this point that we believe the trial court erred as a matter of law in failing to look at the circumstances of the interrogation in totality. The detective's repeated insistence that the truth could only be the version told by the victim, combined with her unequivocal statements that there was semen on the victim's pajamas and her belief that the DNA in it would match Stone's, followed by statements to the effect that only confessing could keep him out of jail or affect the length of his jail term made the circumstances unduly coercive. Moreover, a close examination of the interrogation reveals that Stone did not volunteer facts but rather he adopted facts as they were suggested to him by the detective and as her insistence that he tell "the truth" became more adamant. For example, this exchange constituted the first point at which Stone went beyond denying that anything at all had happened:

"JS: But see, I don't know why she would say this. I would never touch a little kid.
"KM: Okay.
"JS: I wouldn't.
"KM: Do you sleep walk? I mean—
"JS: No, I don't. I know that for a fact.

"KM: Okay. I mean, would it be that she's just, I mean she—she misses her dad and you said that she got very attached to you. Uh—did she maybe, I don't know crawl into bed with you one night or last night was she, do you remember when she came out to get a drink did she come over and give you a hug or say anything.
"JS: One time—one time, she did come over and give me a hug.
"KM: Last night?
"JS: Yes. That's—that's it. But no, nothing like that else like that happened.
"KM: Okay.
"JS: I wouldn't do that and I would not even touch that little girl, let alone a little kid."

Another tactic used by Detective Mar involved minimizing the seriousness of the accusations against Stone and indicating that a confession would corroborate that he was not a child sex predator:

"JS: But I wouldn't do that. I wouldn't.
"KM: I mean, it's not saying that you're a horrible person, it's saying that, you know, you've been under a lot of pressure and you've been very tired like you said, you know, it's—it's a release. That kind of sexual, you know, it's just masturbation. It's not sex.
"JS: If I—if I had that kind of sex—sexual tension or whatever I wouldn't do that with a little a minor or nobody. I would go and I would get myself a girlfriend.

. . . .

"KM: There was no sex. I mean, she's not saying that you had sex with her but that you just had her, just basically just jack you off. And that's, you know, that's not a big deal. It's not, I mean it's not full blown sex. You know, it's just—just a little hand job that's all.
"JS: But I wouldn't have a little kid do that.
"KM: Okay.
"JS: If I wanted to do it I'd do it in my damn my—myself.
"KM: Okay. But you never answered my question. So, is she lying?
"JS: Yes.

. . . .

"KM: I'm just wondering Josh, you know, it's—it's not like this is full blown sex, okay. This is a hand job, alright.
"JS: Okay. But—that still don't matter
"KM: I mean, if that's what it was, that's what it was. Tell us the truth. I mean, that's all we want to know.
"JS: —But—I'll go to jail tonight. And I don't want to, I'm trying to keep myself out of jail period.
"KM: Okay. So—
"JS: ———————.

"KM: —tell the truth. Okay. [A.J.] is nine years old. And we need to get her some help. We need to get her some counseling. We need to get you some help. We need to get you some counseling.

. . . .

"KM: Yeah, I understand. You know, Josh, I believe you—you know you're telling me, you know, pieces of the truth. And I believe you want to tell me you know.

"JS: But I didn't do it.

"KM: Well, I'm not saying that your—that you—you forced her. I'm just saying that I mean she was—she came with you out to the living room willingly. I'm not saying you forced her.

"JS: I didn't have her do nothing like that to me. And I wouldn't have no.

. . . .

"JS: Basically, what you're telling me is that I did do it.

"KM: I'm telling that that's exactly what happened. I think that you did pick her up from her room, bring out into the couch, sat down on the couch, put her hand around it and showed her and had her jack you off. Not because you have a fetish or that you're preying or anything else, but it's somebody different. It's somebody else helping you get gratification that you needed because you're stressed out and over working and tired and everything else. And I, I'm pretty—I'm pretty sure that she's telling me is the truth. And I also know that when I match the DNA off the couch and off her shirt with the DNA from your mouth, it's all gonna match. All of it. Because she's telling me the truth. So, now, I'm just asking you to tell me the truth. Help yourself. It's gonna help you because it's gonna show that you're not, you didn't prey on her. You didn't force her. You didn't intentionally did this. It was one of those, okay, you had a, you're tired, you're not feeling good, you made a bad choice, a bad judgment. Okay. Or are you this guy that's been preying on this little girl that took her and forced her to jack you off, because you're just a—a pedophile that preys on little girls? So, help me figure out what—what—what happened and what kind of a person are you. Were you sick and tired, and you know what, you made a bad choice because you needed some tension release. Or are you this person that preys on these little girls that—that drags her in and gets your gratification by little girls jacking you off?"

These statements cumulatively and strongly suggested to Stone that only confessing to the "truth" as the detective saw it would save him from being painted as a "preying pedophile" and, in turn, affect his sentence.

In *State v. Swanigan*, 279 Kan. 18, 106 P.3d 39 (2005), the defendant was accused of robbing a convenience store. Before en-

tering, the robber had put his hand to the window and looked into the store. Swanigan was picked up several days after the robbery and interrogated. During the interrogation, the officers repeatedly told Swanigan that his fingerprints had been found on the window. After reviewing the tape recorded interrogation, this court found "no express threats were uttered, but . . . evidence of implied threats exist[ed] on the audiotape" and the implied threats were intertwined with the officers' urgings that Swanigan cooperate. 279 Kan. at 26. The officers told Swanigan that he needed to " 'come clean' " in order to establish that he had not taken part in a number of other crimes:

> " 'We just want to know your involvement in yours. That's all we want to know from you, so that you don't get charged with all of them. Cause I honestly don't think you're involved in all of them.' " 279 Kan. at 26.

This court found that the lies regarding the fingerprints were one circumstance that must be considered along with others in the case including the police interrogation tactics, and that the implication of negative consequences if Swanigan did not "cooperate" was inconsistent with his rights articulated in *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1966), and another circumstance to be factored into the totality.

> "Although any one of these factors which Swanigan asserts—his low intellect and susceptibility to being overcome by anxiety, the officers' repeated use of false information, and their threats and promises—may not be sufficient to show coercion, the combination of all of them in this case leads us to conclude as a matter of law that Swanigan's October 31 statement was not the result of his free will, but was involuntary." *Swanigan*, 279 Kan. at 39.

This case has much in common with *Swanigan*. While any one of the circumstances surrounding this interrogation, standing alone—Stone's condition, Detective Mar's misleading statements about the semen on the pajama top, her statements that the length of his sentence could only be affected by his telling the "truth," the implications he would be viewed as a sexual predator unless he confessed—might not have led us to conclude Stone's statements were coerced, a review of the audio recording taking into account

all of these circumstances, as the law requires, leads us to conclude as a matter of law that Stone's statements were not the product of his free and independent will and that it was error to admit them at trial.

During deliberations, the jury asked to hear nearly the entirety of the evidence again, focusing specifically on the portions of Stone's interrogation where he starts to say that, while not at his behest, something did happen between himself and A.L. After hearing that testimony again, the jury informed the court that it was deadlocked and could not reach a verdict. Only after being sent back to the jury room did it return a verdict and then only on one of the least serious of the four crimes with which Stone was charged—the aggravated indecent liberties charge that alleged he submitted to her touching. Under these facts, it is impossible to conclude beyond a reasonable doubt that the admission of the statements Stone made during the interrogation were not key to the jury's verdict; therefore, we must reverse that verdict and re-mand the case for a new trial at which the statements made by Stone to Detective Mar are not admissible. See *Arizona v. Fulminante*, 499 U.S. 279, 310, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991); *Swanigan*, 279 Kan. at 45-46.

The conviction is reversed, and the case is remanded to the district court for a new trial at which Stone's statements to the detective are not admissible.