NOT DESIGNATED FOR PUBLICATION

No. 114,883

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DOMINIC A. CLARK,
*Appellant*.


MEMORANDUM OPINION

Appeal from Wyandotte District Court; MICHAEL GROSKO, judge. Opinion filed March 24, 2017. Affirmed.

*Michael G. Highland*, of Bonner Springs, for appellant.

*Mollie R. Hill*, assistant district attorney, *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before PIERRON, P.J., HILL, J., and WALKER, S.J.

*Per Curiam*:  Dominic A. Clark appeals his convictions by a Wyandotte County jury of second-degree murder and criminal possession of a firearm by a convicted felon. Finding no errors, we affirm.


FACTS

An investigation into a shooting death at a Kansas City apartment complex led to the arrest of Clark. He was charged with first-degree murder in the death of Kelvin Brown and with criminal possession of a firearm by a convicted felon. A jury found

1

Clark guilty of second-degree murder and criminal possession of a firearm. Clark now appeals those convictions.

At Clark's trial, numerous witnesses testified for the State. Lashelle Dunn and Timmie Ruth Woolridge, who are sisters, were residents of the apartment complex where the shooting took place. Dunn testified that she was in her or her sister's apartment when she heard people arguing outside. She and Woolridge went outside to see what was happening. As they were getting ready to cross the street, Dunn noticed that the arguing got louder and then heard a number of gunshots. Dunn ducked down when the shots started but saw a nice black BMW or Audi speed away from the scene after the shooting stopped. As the car drove past her, Dunn noticed that one of the occupants was wearing a red shirt.

Woolridge's testimony was similar. She testified that she was sitting in her apartment when she heard some men arguing outside. Dunn then yelled up at Woolridge from her back balcony and told Woolridge to come outside and go with her to see what was happening. Woolridge went down the stairs and was headed in the direction of the argument when she heard gunshots. She ducked down until the shooting stopped then ran towards the victim. As she ran, Woolridge noticed a dark colored BMW driving down the road toward her but away from the shooting. Woolridge could see two men in the front seat of the car, one of whom was wearing a red-hooded shirt. The other man had on a darker-hooded shirt.

Jeffrey Kerwin testified that approximately 30 minutes after the shooting, he was waiting to meet a tenant in the parking lot of an apartment building he managed in the Westport area of Kansas City, Missouri, when a black BMW pulled into the parking lot and stopped by one of the dumpsters. Kerwin watched from his car as the driver of the BMW got out, removed the red-sleeved jacket he was wearing, and threw the jacket and a bag into the dumpster. Kerwin was able to get a good look at the driver when he exited

2

the vehicle. Kerwin identified Clark as the driver. Kerwin noted that Clark's hair was different on the day of the trial and that he was wearing new glasses, but he believed Clark to be the same man he saw wearing the red-sleeved jacket and driving the BMW.

Shortly after the driver returned to the BMW and left the parking lot, Kerwin met with the tenant. After the meeting, Kerwin went to the dumpster to investigate. In the dumpster, he saw the jacket and the bag that he watched the driver of the BMW place there. Kerwin picked up the bag to look inside and noticed that it contained two handguns. Kerwin then put the bag down and called the police. Officer Robert Shorrock responded to Kerwin's call. Shorrock testified that he collected the bag and the jacket out of the dumpster.

Those items were eventually transferred to the Kansas Bureau of Investigation (KBI) so that they could be tested for DNA and fingerprints. Jennifer Solado, a forensic scientist at the KBI, testified that she took cuttings from several places on the red jacket. She then tested the samples to determine if they contained any DNA evidence. Each sample contained Clark's DNA as the major contributor, *i.e.*, while more than one person's DNA was present, Clark's was the most pervasive. This was especially true on the collar of the jacket—a place that was tested to reveal who was wearing the jacket— because it was the spot most likely to come into direct contact with the skin of the wearer.

Solado also obtained DNA evidence from the handguns. One of the handguns, a Glock, was swabbed in four different areas—the grip, trigger, slide, and safety. The grip and trigger contained DNA from three contributors, but the major contributor was Clark. The second gun, a Smith & Wesson, was also swabbed but contained insufficient quality and quantity of DNA to be able to determine to whom the DNA belonged.

KBI toolmark examiner, Zachary Carr, also testified at Clark's trial. Carr was given the task of examining bullets, bullet fragments, and bullet casings that were

recovered from the scene of the shooting and the body of the victim. Carr concluded that one bullet recovered from the scene was definitely fired by the Glock recovered from the dumpster. Additionally, he determined that four separate bullet fragments recovered from the scene had characteristics indicating they could have been fired by the Glock. Carr also testified that four bullet casings recovered from the scene were fired by the Glock. Of the bullets and bullet fragments recovered from the victim's body, one bullet appeared to have been fired by the Smith & Wesson. A second bullet could not be confirmed to have been fired by the Smith & Wesson but was definitely not fired by the Glock. The weapon from which the remaining four bullets or bullet fragments found in the victim's body was fired was not identified.

At the close of evidence, the jury was instructed on first-degree murder as well as the lesser included offenses of intentional second-degree murder and voluntary manslaughter. The jury was also instructed that a person may be found guilty of a crime if the person, "either before or during its commission, and with the mental culpability required to commit the crime intentionally aids another to commit the crime." The jury returned a verdict finding Clark guilty of intentional second-degree murder. Clark now appeals.

ANALYSIS

*Sufficiency of the evidence*

On appeal, Clark first argues that the circumstantial evidence presented at trial was insufficient to convict him of second-degree murder. Clark essentially contends that an eyewitness would have needed to place him at the scene in order for his conviction to be valid.

When the sufficiency of the evidence used to convict a defendant is challenged on appeal, this court reviews the evidence in the light most favorable to the prosecution. The conviction will be upheld if we are convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on the evidence. In conducting this review, we generally will not reweigh the evidence or make determinations regarding the credibility of witnesses. *State v. Williams*, 299 Kan. 509, 525, 324 P.3d 1078 (2014). It is only in rare cases, where no reasonable factfinder could have found guilt beyond a reasonable doubt from the evidence presented at trial, that a guilty verdict will be reversed. *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983). Convictions of even the most serious offenses can be based entirely on circumstantial evidence as long as the evidence provides a basis for a reasonable inference by the factfinder regarding the fact in issue. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016).

Here, neither of the eyewitnesses at the scene of the shooting saw the occupants of the car well enough to describe or identify them. Nevertheless, both Dunn and Woolridge saw a nice black car, which one identified as a BMW and the other described as either a BMW or an Audi, speed away from the scene. Additionally, both testified that one of the individuals in the car was wearing a red jacket or hoodie. Shortly thereafter, Kerwin saw a black BMW being driven by a man wearing a jacket with red sleeves pull into a parking lot. He then observed the driver exit the vehicle, take off the jacket, place the jacket and a bag into a dumpster, and then drive away. Kerwin was able to identify Clark as the driver of the car. The jacket contained Clark's DNA as did one of the guns that was found in the discarded bag. The guns in the bag were linked to the scene of the shooting by the toolmark examiner who identified bullets and bullet casings that had been fired from each gun. One of the bullets that was found inside the victim's body was positively identified as having been fired from one of the guns.

While Clark was not positively identified as being at the scene, there is sufficient evidence from which a reasonable jury could have found Clark guilty of either directly

5

killing the victim or of intentionally aiding another in killing him while possessing the intent to kill the victim. See *State v. Penn*, 271 Kan. 561, 564, 23 P.3d 889 (2001) (affirming murder conviction based on circumstantial evidence tying defendant to crime).

*Prosecutor's comments during closing arguments*

Clark next argues that his right to a fair trial was jeopardized by prosecutorial misconduct during closing arguments.

On review of a claim of prosecutorial misconduct (now prosecutorial error), this court's analysis has two parts. First, we must determine whether the statements of the prosecutor fell outside the wide latitude afforded to prosecutors when discussing the evidence. If we find that the comments exceeded the scope of proper argument, we must next determine whether the prosecutor's error prejudiced the defendant's right to a fair trial. Whether the defendant's right to a fair trial was jeopardized is determined by applying the constitutional harmless error test, *i.e.*, the "error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record.'" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

The first statement Clark takes issue with is the prosecutor's statement, "Mr. Kerwin also said that he was cautious in the fact that he didn't want to step out of his car and take a photo of this individual. The State believes the testimony was that it didn't affect his ability. He remembered exactly what happened." Clark argues that this constituted the prosecutor vouching for the veracity and accuracy of the witness' testimony.

The second statement Clark complains of was when the prosecutor said, "And the State believes that the defendant—the testimony showed that the defendant with another

6

were firing at Kelvin Brown that day, and as a result of that firing at him multiple shots killed Kelvin Brown." Clark argues that in this statement the prosecutor "interjected her own beliefs as to the veracity of the witness statements, and the quality of the evidence."

The State contends that these statements did not fall outside the wide latitude afforded prosecutors in crafting arguments. The State reads the first statement as the prosecutor "not commenting on the credibility of the witness Jeffrey Kerwin but instead summarizing his testimony. Kerwin himself testified that he believed the defendant to be the same person and that him feeling cautious and not getting out of the car did not affect his ability to identify the defendant." As for the second statement, the State contends that the prosecutor immediately corrected herself and restated her summary of the evidence in a more neutral way. Even if these statements were erroneous, the State contends that the error was harmless.

While it is generally true that a prosecutor should not give personal comments on the evidence, including the credibility of witnesses, the prosecutor here does not appear to have erred. See *State v. Stone*, 291 Kan. 13, 19, 237 P.3d 1229 (2010). The first time the prosecutor said the word "believe," it seems that what she meant was not that she believed Kerwin's testimony, but what she recalled was that he testified that the fact he was in his car did not keep him from seeing and being able to later identify Clark. Although the prosecutor's statement was not artfully worded, we concur with the State's position that the prosecutor was merely giving her recollection of the evidence and not trying to bolster Kerwin's credibility. In this light, we do not view the comments as misconduct.

As the State notes in its brief, the second time the prosecutor said that she "believe[d]" something, she immediately corrected herself with a more appropriate statement, *i.e.*, "the testimony showed." The corrected statement is the type of statement that our Supreme Court has approved of in the past. See *State v. Peppers*, 294 Kan. 377,

7

400, 276 P.3d 148 (2012) ("It is necessary . . . for a prosecutor to say something akin to 'the evidence shows defendant's guilt' in order to make a statement merely directional and not an expression of the prosecutor's personal opinion."). The prosecutor's statement came at the end of her summary of the evidence and directed the jury as to what it should do with the evidence. But even if we were to construe the prosecutor's statements as improper, the error was certainly de minimus, and was corrected immediately by using the appropriate *Peppers*-approved phrasing.

In our view, neither of the statements Clark challenges constituted prosecutorial error. Because of this, it is unnecessary to proceed to the second step of the analysis.

Affirmed.