NOT DESIGNATED FOR PUBLICATION

NOS. 122,229
122,415

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOSE ELIASAR PORTILLO-VENTURA,
*Appellant*.


MEMORANDUM OPINION


Appeal from Hamilton District Court; WENDEL W. WURST, judge. Opinion filed February 25, 2022. Convictions reversed, sentence vacated, and case remanded for a new trial.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.


Before SCHROEDER, P.J., WARNER and ISHERWOOD, JJ.


PER CURIAM: The State charged Jose Eliasar Portillo-Ventura with aggravated indecent liberties in case number 18 CR 130, and rape, aggravated indecent liberties, and attempted aggravated indecent liberties in case number 18 CR 131. The court conducted a consolidated trial, and a jury returned a guilty verdict on all counts. Portillo-Ventura advances three arguments on appeal. First, he contends the prosecutor erred by twice commenting on witness credibility, making a "golden rule" argument, and asking the jury to protect the victim. Second, he argues that his stipulation to an element of the crimes without proper waiver of his constitutional rights violated his right to a jury trial under

1

*State v. Johnson*, 310 Kan. 909, 453 P.3d 281 (2019). Finally, he argues that his criminal history score was incorrectly calculated because the sentencing court counted the felonies in each case toward his criminal history score in the other case. Our review of the record reveals that the State improperly commented on the credibility of a witness and that the error demands reversal of Portillo-Ventura's convictions. Because the matters addressed in his two remaining claims could conceivably recur upon any retrial here, we offer an abbreviated discussion of those issues.

FACTUAL AND PROCEDURAL BACKGROUND

Juries in sex crimes prosecutions are frequently called upon to be the arbiter in credibility contests between victims and their alleged perpetrator. That was indeed a focal point for the jury in Jose Portillo-Ventura's case given the scant amount of evidence available to corroborate the victim's accounts.

P.F. testified that in the summer of 2017, when she was only 13 years old, she attended a family barbeque at her father, D.F.'s, home in Hamilton County, Kansas. Portillo-Ventura was also present at the festivities.

She recalled that the picnic attendees planned to go swimming later in the day so she dressed accordingly in a two-piece swimsuit and shorts. At one point, while P.F. waited to leave for the pool, Portillo-Ventura entered the living room and sat down on a couch across from her. According to P.F. he gave her a "leering look" that made her so uncomfortable she got up and retreated to the restroom.

Sometime later, P.F. exited the restroom and Portillo-Ventura met her in the hallway. P.F. informed the jury that he pushed her against a nearby washer and dryer, tried to kiss her, and placed his hand against her vagina, over her clothing. She shoved Portillo-Ventura and walked away.

2

Shortly thereafter, as the entire group congregated outside her father's residence to leave for the pool, P.F. realized she had forgotten her earbuds, so she went back inside. She testified that Portillo-Ventura followed her and pulled the door closed behind him. He pushed P.F. against the door, reached between her legs, and rubbed her vagina over her clothing.

P.F. acknowledged for the jury that she did not scream or immediately report Portillo-Ventura's inappropriate behavior to an adult. She explained that she instead opted to remain silent because Portillo-Ventura was considered to be like family, and she feared disrupting that dynamic.

P.F. eventually opened up about the incidents to C.V., Portillo-Ventura's young stepdaughter. At the time of that disclosure, P.F. also asked her whether Portillo-Ventura ever fondled her. C.V. provided a negative response so P.F. did not press the issue despite being concerned for C.V.'s safety. At the time, C.V. did not believe P.F.'s accusations.

Around a week later, D.F. hosted another barbecue at his residence. According to P.F., several adults, including D.F., got very intoxicated so her stepmother, J.C., decided to remove P.F. from the situation. She initially drove P.F. to Portillo-Ventura's home but when they arrived, P.F. refused to get out and told J.C. that Portillo-Ventura had fondled her.

P.F. informed the jury that the group congregated once more the next day. The adults called P.F. into the room and, with Portillo-Ventura present, pointedly asked P.F. whether he fondled her. She testified that she responded in the affirmative, but the group refused to believe her. P.F.'s father yelled at her and accused her of lying, while her stepmother warned her that she was going to hell. According to P.F., of the twelve adults in the room, only M.M., P.F.'s step-grandmother, believed her.

3

C.V. also testified and described for the jury that, in time, Portillo-Ventura also touched her inappropriately. For example, in one instance, he came up from the basement as C.V. washed dishes in the kitchen. He grabbed C.V. around the waist, turned her to face him and then placed one hand on her breast and the other on her vagina. C.V. told the jury that she was moving away to seek refuge in a bedroom where her brother and sister were playing video games.

Portillo-Ventura then directed C.V. to retrieve cash from the bathroom where C.V.'s mother, M.R., often left it in case anyone in the household needed it. C.V. called out to her sister to get the money instead, but her sister ignored the request. C.V. testified that she relented and grabbed the money but as she attempted to leave the bathroom, Portillo-Ventura blocked the door in an effort to prevent her exit. C.V. managed to push past him and joined her siblings in the bedroom. According to C.V., Portillo-Ventura entered the bedroom a few minutes later and repeatedly apologized.

C.V. recounted for the jury that she eventually told her mother, M.R., about the dishwashing incident and the disclosure induced M.R. to kick Portillo-Ventura out of the house, but only briefly. A few days later M.R. allowed him back into the house. C.V. explained that she did not feel as though her mother believed her, so she opted not to tell anyone else.

The jury also heard testimony from C.V. regarding a second incident that occurred as she lay in her bedroom. C.V. shared with them that Portillo-Ventura came in, laid down next to her, and kissed her "[l]ike a boyfriend/girlfriend make out." He rubbed her vagina on the outside of her clothes and placed her hand on his erect penis. At the time, C.V. and Portillo-Ventura were alone in the house.

4

C.V. recalled two additional encounters she had with Portillo-Ventura. In one instance, as she slept on the couch, he lifted her underwear, and put his finger in her vagina. On another occasion, Portillo-Ventura came up from the basement to prepare for work while C.V. watched television on the couch. He went into the restroom and came out a short time later with his zipper down and his penis fully exposed. She told the jury that he waved at her and beckoned for her to come over. C.V. refused so he went back into the restroom and closed the door. Later, Portillo-Ventura exited the restroom fully clothed, gave C.V. ten dollars, and called her a "puta" which translated means "whore." C.V. threw the money at him as he left for work. C.V. informed the jury that each of the four incidents occurred after P.F. revealed to her that Portillo-Ventura touched P.F. during the barbecue. C.V. testified that she was only 10 years old during the acts.

On December 7, 2018, M.M., C.V.'s grandmother, contacted the Hamilton County Sheriff's Office and explained that Portillo-Ventura sexually assaulted C.V. Roughly twenty minutes later, J.C. called the Sheriff's Office and informed them that Portillo-Ventura assaulted P.F. J.C. later acknowledged to investigators that she delayed reporting because she initially did not believe P.F. She felt that perhaps enough time had passed that the issue had resolved itself.

The Sheriff's Office assigned Sergeant Justin Klebba to follow up on the case. Klebba scheduled forensic interviews for the two girls with Kelly Robbins, the executive director of the Western Kansas Child Advocacy Program. Though P.F. at first expressed hesitancy in the process, she ultimately underwent an interview and told Robbins that Portillo-Ventura molested her. P.F. also identified Portillo-Ventura in a photo lineup. C.V.'s interview was scheduled to occur the day after but neither C.V. nor her mother, M.R., wanted her to participate. M.R. initially gave permission for the interview but cancelled the night before it was to occur.

5

Klebba then reached out to DCF, which advised him that the interview could be conducted at C.V.'s school. C.V. participated in the interview at her school the following day. Shortly after the interview began, M.R. arrived and attempted to physically intervene and terminate the meeting. C.V. likewise disclosed that Portillo-Ventura fondled her.

The investigation yielded charges against Portillo-Ventura, filed under two separate complaints. The first, case number 18 CR 130, related to the incidents involving P.F. and included one count of aggravated indecent liberties with a child. The second case, 18 CR 131, addressed the acts perpetrated against C.V. and included a single count each of rape, aggravated indecent liberties with a child, and attempted aggravated indecent liberties with a child.

The two cases were consolidated for trial. Justin Klebba, Jason LaRue, Kelly Robbins, P.F., and C.V. were all called as witnesses for the State. Portillo-Ventura exercised his right to not testify. The defense rested without calling any witnesses.

During closing argument, counsel for Portillo-Ventura argued that P.F. and C.V. simply were not credible. He argued that "a mother knows," highlighting the fact that M.R. and J.C. were reluctant to believe the allegations or participate in the investigation. He also suggested Robbins was not an objective fact-finder because during the forensic interviews she did not question the victims' accounts. He specifically targeted P.F.'s claims as particularly questionable because the first inappropriate touching allegedly occurred while other adults were present in the home. He also highlighted the fact that P.F.'s family did not consider her allegations to be credible. As for C.V., Portillo-Ventura reminded the jury how C.V.'s mother allowed Portillo-Ventura back into the house just days after C.V.'s first accusation, and that her remaining allegations likewise occurred while others were present in the home.

The jury returned a guilty verdict for all four counts and the district court sentenced Portillo-Ventura to 308 months in prison. Portillo-Ventura timely appealed.

ANALYSIS

DID THE PROSECUTOR MAKE COMMENTS TO THE JURY DURING OPENING STATEMENTS AND CLOSING ARGUMENTS THAT AMOUNT TO REVERSIBLE ERROR?

Portillo-Ventura argues that the prosecutor committed reversible prosecutorial error by improperly vouching for the credibility of the victims and inflaming the passions of the jury. He contends these errors are not harmless, requiring reversal of his convictions and remand for a new trial.

*Preservation and Standard of Review*

Portillo-Ventura did not object when the prosecutor uttered the questionable remarks to the jury. Claims of prosecutorial error for comments made during the opening statement and closing argument are preserved for appeal even if no objection was made at trial. *State v. Miller*, 293 Kan. 535, 550, 264 P.3d 461 (2011). Accordingly, this issue is properly preserved for review. We may, however, consider the presence or absence of a contemporaneous objection in our analysis of the alleged error. *State v. Butler*, 307 Kan. 831, 864, 416 P.3d 116 (2018).

Reviewing courts analyze prosecutorial error claims in two steps. *Miller*, 293 Kan. at 550. First, "the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). Next, "[i]f error is found, the appellate court must [then] determine whether the error prejudiced the defendant's due process rights to a fair trial." 305 Kan. at 109.

7

"[P]rosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" 305 Kan. at 109 (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011], *cert. denied* 565 U.S. 1221, 132 S. Ct. 1594, 182 L. Ed. 2d 205 [2012]).

Portillo-Ventura argues that four instances of prosecutorial error plagued his case. The allegations fall under two well-known, broad categories: vouching for witness credibility and remarks designed to inflame the passion or prejudice of the jury.

*Witness Credibility Statements*

Portillo-Ventura first contends prosecutorial error occurred when the State improperly commented on the credibility of its witnesses. Kansas courts have consistently held that "a prosecutor telling a jury in opening statement or closing argument that a witness told the truth is error." *State v. Hirsh*, 310 Kan. 321, 342, 446 P.3d 472 (2019). Such conduct is properly considered erroneous because "expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony, not commentary on the evidence of the case." *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 (2000). Portillo-Ventura argues such impermissible vouching occurred two times, once in the State's opening remarks and again in its rebuttal closing argument.

First, Portillo-Ventura highlights the following phrase from the prosecutor's opening statement:

> "The second incident occurs, or at least we think it's second in time. *I will tell you right now I believe this witness.* Which is first, second, and third, the only one I think she will be certain about is the kitchen incident. But she is asleep or almost asleep on the couch or mattress. The defendant he sits down, lays down, comes up beside her. I believe

8

this is the incident where she says he started kissing me like he was making out.
(Emphasis added.)

Portillo-Ventura argues that the italicized statement constitutes error because the prosecutor unequivocally told the jury that he believed C.V. The State attempts to analogize its conduct with that at issue in *State v. Love*, 305 Kan. 716, 728, 387 P.3d 820 (2017). In its brief, the State argues that the prosecutor's comments in *Love* were found to be permissible because they aligned with the principle that "an opening statement to the jury affords lawyers the chance to outline what they anticipate the evidence will show and how that evidence fits with their theory of the case."

While the portion of *Love* to which the State cites does suggest that "counsel may outline in opening statement what is expected to be proved," 305 Kan. at 728, the distinguishing factor is that the sentence challenged by Portillo-Ventura does not reference potential testimony per se. Rather, the prosecutor's use of "I believe" is directly followed by "this witness." As a result, a listener would most likely interpret the words to mean that the prosecutor validated C.V. as a truthful individual. *Love* is inapplicable here.

The State next acknowledges that "standing alone, this sentence does read as though the prosecutor is offering his personal opinion that he believes C.V., which is improper." Even so, it then argues that such an interpretation is inaccurate because a fair reading of the transcript reflects that the sentence does not make sense within the wider context of the paragraph, therefore, it is possibly the product of a transcription error. But the State does not provide any evidence to support this claim. The record before us contains nothing which tends to indicate that steps were undertaken to resolve whether such an error truly occurred. Thus, the State simply urges us to speculate and trust that the comments were not actually uttered as transcribed. This we cannot do. While the paragraph is indeed awkward, we are bound by the record before us and that record contains an unquestionably problematic statement. As a result, the prosecutor's statement

9

that he believed C.V.'s testimony violates the first element of the prosecutorial error test because the prosecutor ignored his special obligation to avoid "improper personal insinuations." *Pabst,* 268 Kan. at 510. We have no difficulty concluding that this statement falls well outside the wide latitude prosecutors are afforded.

The second allegation of improper bolstering cited by Portillo-Ventura arises out of the following italicized portion of the State's rebuttal closing argument:

> "Well, sadly, ladies and gentleman, the answer to some of [defense counsel's] questions that he posed to you are simply that we had alcohol and drug addled—addled people trying to raise kids. Sad as it is, it's not unusual.

> "At the end of the day those two little girls sat on that stand, and it's simple, like I told you, did they tell you the truth? *I think the truth has a ring to it. I think you heard it.* If you did, the cloak of innocence is gone. *We know the defendant is guilty because the evidence showed you that the truth was spoken.*

> "Ladies and gentleman, [P.F.] suffered a great deal. Can you imagine telling your aunt that you won't get out of the car because you're not going in the house where that guy is, and then a few days later meeting a bunch of friends and family and adults and they all accuse you of lying? And the only thing you can do is you say, yes, you did, you touched my vagina, and then cling to that truth for a long time.

> "Now, is it surprising that this child did not want to participate in this process? It's not like these children were pushing to bring this case. It's because we have a duty when we know, to act and try to prevent this from happening." (Emphases added.)

Portillo-Ventura argues that the discussion of "truth" in the second paragraph constitutes prosecutorial error because it is a direct indication that the prosecutor believed his witnesses told the truth and he sought to convey the same to the jury. The State responds by citing *State v. Stone*, 291 Kan. 13, 19-20, 237 P.3d 1229 (2010), for its

observation that context is an important factor to consider when reviewing for prosecutorial error.

The defendant in *Stone* was convicted of one count of aggravated indecent liberties with a child and argued on appeal that the prosecutor made several statements in closing argument that constituted improper comment on a witness' credibility. The precise targets of Stone's challenge included the prosecutor's comments that the victim, A.L., "'told you what happened,'" and that "'[A.L.] told you what happened. She showed you what happened. She is a credible witness.'" 291 Kan. at 16. On review, our Supreme Court determined that while the remarks were potentially problematic when viewed in isolation, they did not ultimately warrant a new trial because they bracketed a permissible argument "that detailed for the jury factors that it could and should consider in determining the credibility of the witness." 291 Kan. at 19. Specifically, the prosecutor advised the jury it could be mindful of eye contact, common knowledge, common experience, and the words used by witnesses. 291 Kan. at 19.

The State implores us to favorably consider *Stone* because the complained of statements here were also bookended by reminders to the jury that it was their duty to determine the credibility of the victims. It directs us to the fact that the State first recalled for the jury that the primary question it needed to resolve was whether P.F. and C.V. told the truth:  "At the end of the day those two little girls sat on that stand, and it's simple, like I told you, did they tell you the truth?" The State then highlights the fact that it concluded its rebuttal argument with a second reminder:  "It doesn't matter what I say. It's about the evidence and whether you believe those two little girls. It's for you to decide, did they speak the truth, and then to do your duty." The State thus suggests that the prosecutor did not strategically use the word "truth" to send a message to the jury regarding his personal views of the testimony. Rather, he simply directed the jury to the relevant evidence it could consider when evaluating the credibility of the girls' testimonies. The State then offers a laundry list of factors that the prosecutor suggested

11

the jury should consider, including the victims' demeanor, consistency of reporting, and their initial concern about testifying because of prior adult disbelief.

Portillo-Ventura also addresses *Stone* and endeavors to highlight distinctions between it and his case. He argues that, unlike *Stone*, the prosecutor here never identified evidence for the jury to rely on when evaluating the victims' credibility, nor did the State offer specific guidance regarding how to evaluate the testimony C.V. and P.F. provided. Therefore, it is his position that the State's analogical argument is tenuous because the factor that insulated the prosecutor in *Stone*—the explicit directions for credibility evaluation that validated an otherwise problematic statement—is absent from the prosecutor's argument here.

The record does not support Portillo-Ventura's contentions. Although the prosecutor never explicitly described *how* the jury should evaluate the testimony at issue, the transcript of his rebuttal argument reflects that his "truth" statements were uttered in response to remarks defense counsel made in closing argument about the victims' statements. That is, the prosecutor's closing did relate to reliability and the challenged remarks were bracketed by statements advising the jury that it had a duty to evaluate the victims' credibility. Read in context, as we are required to do, the prosecutor's statements are more accurately described as his attempt to summarize the conclusion to which an assessment of the evidence would lead the jury, that the victims' testimony provided sufficient evidence to find Portillo-Ventura guilty beyond a reasonable doubt.

In this same vein, the State also argues that its comments about the "truth" align with rhetorical questions previously upheld by Kansas courts. It first cites *State v. Ortega*, 300 Kan. 761, 775, 335 P.3d 93 (2014), which held that when discussing the credibility of certain testimony, the prosecutor may explain why a defendant might have a motivation to lie. The *Ortega* court declined to assign error to the challenged statement because it found that "merely explaining what the jury should look for in assessing the

credibility" of the witnesses was distinct from the prosecutor "stating his or her own personal opinion concerning a witness' credibility or accusing a witness or defendant of lying." 300 Kan. at 775-776. The State's discussion of *Ortega* is persuasive given that the prosecutor's rebuttal argument simply constituted a response to Portillo-Ventura's closing argument and merely advised the jurors that in its discernment of the truth, it should consider the evidence adduced and that evidence included the testimony provided by P.F. and C.V.

In sum, the remark uttered by the prosecutor in his opening statement falls outside the latitude afforded the State and constitutes error. The same cannot be said for the comments Portillo-Ventura challenges in the prosecutor's closing argument.

*Inflaming Jury Passion*

Portillo-Ventura next argues that the prosecutor engaged in two forbidden "golden rule" arguments. Such arguments seek to have the jurors place themselves in the position of a victim or a victim's family member. *State v. Thomas*, 311 Kan. 905, 911, 468 P.3d 323 (2020). They are generally considered improper because they encourage the jury to decide the case based on personal interest or bias rather than a neutral assessment of the evidence and controlling law. *State v. Corbett*, 281 Kan. 294, 313, 130 P.3d 1179 (2006).

The prosecutor made the statement in question during rebuttal argument:

> "Ladies and gentleman, [P.F.] suffered a great deal. Can you imagine telling your aunt that you won't get out of the car because you're not going in the house where that guy is, and then a few days later meeting a bunch of friends and family and adults and they all accuse you of lying? And the only thing you can do is you say, yes, you did, you touched my vagina, and then cling to that truth for a long time."

13

The State asserts that these remarks do not support a "golden rule" argument. Rather, the prosecutor simply asked the jury to imagine, in light of the volatile circumstances surrounding her disclosure, why she might hesitate to cooperate with law enforcement. The State notes that this intent is also evidenced by a question posed shortly after the statements reflected above, in which the prosecutor queried "is it surprising that this child did not want to participate in this process." As described above, defense counsel's strategy during closing arguments was to attack the victims' credibility by homing in on their delayed disclosure and the family's extreme skepticism. The record reflects that when the statements challenged by Portillo-Ventura are reunited with their surrounding context, it reveals that the prosecutor's true intention was to attempt to rehabilitate the victim and her testimony, not undermine the jury's neutrality. As noted by the district court, when it denied a similar claim in Portillo-Ventura's posttrial motion, the statements simply constituted another reminder to the jurors that any decisions regarding witness credibility were theirs alone to make.

By contrast, *State v. Lowery*, 308 Kan. 1183, 427 P.3d 865 (2018), offers a clear illustration of an authentic "golden rule" argument. Lowery participated in a drive-by shooting directed toward a wedding party, that resulted in the death of the bride. During closing argument, the prosecutor asked the jury to imagine the shooting from the perspective of the newlyweds: "Think for yourself. What would be your reaction in that moment as you're driving, just having been married, having a great time, your bride leaning her head on your shoulder as you're going down the street and then you hear this loud noise?" 308 Kan. at 1208. The court found the prosecutor committed error because they impermissibly sought to inflame the passion of the jury through a "golden rule" argument. 308 Kan. at 1209.

*State v. De La Torre*, 300 Kan. 591, 331 P.3d 815 (2014), offers another clear example. The State charged De La Torre with child abuse and felony murder for the death of an 11-month-old child. The jury returned a guilty verdict on the child abuse

14

offense, but the court declared a mistrial regarding felony murder. During the State's closing argument in the second trial, it asked the jury to ponder the thoughts in the victim's mind preceding her death. On appeal, the court found this statement improper because it was akin to a "golden rule" argument, did not establish a link between the State's theory and the conduct or testimony of a witness, and had nothing to do with De La Torre's guilt. It simply inflamed the passions of the jury. 300 Kan. at 610.

These cases are readily distinguishable from Portillo-Ventura's. In *Lowery* and *De La Torre*, the prosecutor pointedly encouraged the jury to stand in the shoes of the victims during those crimes. Here, the prosecutor simply posed a question to aid the jury in contextualizing the credibility of a witness. Thus, a "golden rule" violation did not occur. Finding no error, we need not undertake a harmlessness analysis.

Portillo-Ventura also argues that the prosecutor's desire to appeal to the passion or prejudice of the jury manifested in a plea for the jury to protect C.V. His claim arises out of the following, italicized portion of the State's closing argument:

> "Now, is it surprising that this child did not want to participate in this process? It's not like these children were pushing to bring this case. It's because *we have a duty when we know, to act and try to prevent this from happening.*
>
> "[C.V.] told her mother. So we kick dad out of the house. I don't know why two days. And then it continues happening. Is there any reason to think that she would go back down that road again? *Her mother didn't protect her.* So that's – that's what left." (Emphases added.)

Portillo-Ventura directs us to *State v. Duong*, 292 Kan. 824, 834, 257 P.3d 309 (2011), as support for his claim. The *Duong* court explained that it constitutes error when a prosecutor appeals to parental instincts or otherwise urges the jury to protect the victim in child sex crime cases. Portillo-Ventura concedes that an explicit request did not occur,

15

but the challenged phrases sufficiently prompted the jury to infer that it "had a duty to do what C.V.'s mother failed to do."

We are not persuaded. Again, reading the closing remarks in their entirety rather than in isolation, the first comment pertained to the State's duty to prosecute Portillo-Ventura even though the victims did not trust the adults around them. The first comment is directly related to the State's duty to prosecute Portillo-Ventura no matter how distrusting the victims may be of adults. Notably, the statement came directly on the heels of the prosecutor recounting how P.F.'s family berated her for her accusations against Portillo-Ventura. The second comment is a product of the evidence adduced at trial. C.V. specifically testified that her mother failed in her duty to protect her.

There is a readily discernible link between both of the challenged comments and the evidence elicited during Portillo-Ventura's trial. They are also properly classified as statements designed to rehabilitate a witness, which the State deemed necessary given defense counsel's decision to select a credibility challenge as the theme for his closing argument. Portillo-Ventura has failed to show that the remarks at issue constitute error, either independently or collectively.

Portillo-Ventura alleged multiple missteps on the part of the prosecutor. Only one of those constituted error but that error was significant. Again, for the prosecutor to inform the jury "I will tell you right now I believe this witness" carried the potential to outfit the jury with a biased mindset from the very commencement of trial. "The power of the State to charge and prosecute its citizens for criminal violations of the law is a fearsome one, and it is vested exclusively in a prosecutor who is given vast discretion to make both charging decisions and the myriad of practical and strategic decisions that occur in the course of a prosecution." *State v. Sherman*, 305 Kan. 88, 92, 378 P.3d 1060 (2016). An abuse of that role cannot be tolerated.

16

We proceed to the next step of the prosecutorial error inquiry which requires us to determine whether that error in the opening statement can be considered harmless. As noted above, the harmless error test used in Kansas is explained in *State v. Sherman*, 305 Kan. at 88. "Appellate courts must simply consider any and all alleged indicators of prejudice, as argued by the parties, and then determine whether the State has met its burden—i.e., shown that there is no reasonable possibility that the error contributed to the verdict." 305 Kan. at 111. This analysis is fact specific and may include "[m]ultiple and varied individualized factors." 305 Kan. at 110. "While the strength of the evidence against the defendant may secondarily impact this analysis one way or the other, it must not become the primary focus of the inquiry. As has often been repeated, prejudice can exist even 'in a strong case.'" 305 Kan. at 111 (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 240, 60 S. Ct. 811, 84 L. Ed. 1129 [1940]).

We derive guidance for our analysis from *State v. Hirsh*, 310 Kan. 321, where the court considered whether a prosecutor's error in commenting on the credibility of a witness could properly be classified as harmless. It identified three relevant factors to consider: whether the improper comment was repeated or emphasized, whether independent witnesses corroborated the bolstered testimony, and whether the prosecutor reminded the jury that it was the jury's job to make credibility determinations. Using these factors, the court found the error was harmless. 310 Kan. at 343.

Applying the first factor, the error here was not repeated but was most assuredly emphasized. By its very nature, the comment boasted a uniquely forceful effect: "I will tell you right now I believe this witness." The State acknowledges that the nature of the statement impacts the prejudice calculation, yet it seeks to mitigate that impact by asserting that "[t]he alleged erroneous comment from opening statement was singular and not repeated or emphasized to the jury." While it is true that the prosecutor did not repeat the comment verbatim, it is an inaccurate statement to say that that the remark was not emphasized when it was uttered. The prejudicial impact of the prosecutor's use of "I will

17

tell you right now" to preface a statement that, on its face, is explicitly proscribed cannot be overstated. It is particularly disconcerting that the State made the comment during its opening remarks. In our view, that emphatic statement provided the jury with a lens calibrated in the State's favor, through which to view the victims' testimony when it was ultimately elicited. As a result, the first *Hirsh* factor favors Portillo-Ventura.

The second *Hirsh* factor, consideration of that evidence, beyond the bolstered testimony, which tended to establish guilt, does not assuage our concerns. The State argues "there was a considerable amount of evidence presented to find Portillo-Ventura guilty beyond a reasonable doubt." But the record reflects that the testimony of P.F. and C.V. provided the entire foundation for the State's case. So any evidence used to convict Portillo-Ventura ultimately relied on the jurors' determination of whether the victims were telling the truth. See *State v. Dull*, 298 Kan. 832, 838, 317 P.3d 104 (2014) (noting that "many sex crime prosecutions" are "a mere credibility contest between [the] victim and [an] alleged perpetrator"). The State is correct that a lack of physical evidence is not unusual in an instance such as this where the abuse is reported a year after it occurred, but the inevitable absence of corroborating evidence does not alter the fact that the victims' credibility here was of paramount importance. There is therefore a reasonable probability that when the prosecutor affirmatively stated that he believed the witness, the jury accepted that as an intimation that the State determined she was trustworthy, which then adversely impacted Portillo-Ventura's verdict. The second *Hirsh* factor weighs in favor of Portillo-Ventura.

The third *Hirsh* factor contemplates whether "the prosecutor reminded jurors that it was their job to determine the credibility of witnesses." 310 Kan. at 343. Both Portillo-Ventura and the State agree that the prosecutor properly informed the jury of their obligation to make credibility determinations. The State buttresses its assertion by highlighting the fact that the jury instructions also accurately addressed this topic, that the district court properly explained the jury instructions, and the coupling of the two

18

sanitized any possible error. Although this factor generally favors the State, Portillo-Ventura persuasively argues that even if the jurors were aware it was their responsibility to determine the victims' credibility, "[t]he prosecutor's improper comment [made] them more likely, when making their own determination, to find the witness believable." Any mitigating effect surrounding the third factor is thus outweighed by the other two because there is a reasonable probability that the State's emphasis on the witness's veracity, coupled with the lack of corroborating evidence, adversely impacted the outcome of Portillo-Ventura's verdict. The remark the prosecutor made during his opening statement cannot be classified as harmless.

The jury found that Portillo-Ventura perpetrated abhorrent, life altering acts against his young victims. Thus, our decision to reverse those convictions is certainly not one we entered into lightly. We acknowledge and fully appreciate the complexities and emotions attendant to this matter. We are likewise keenly aware of the principle that a criminal defendant "is entitled to a fair trial but not a perfect one." *State v. Cruz*, 297 Kan. 1048, 1075, 307 P.3d 199 (2013). The emphatic stamp of approval the prosecutor gave the victim's testimony in his opening statement, however, likely adversely impacted the jury's ability to conduct a fair and neutral assessment of her credibility. Thus, it cannot be said that Portillo-Ventura received the fair trial to which he is entitled. This case must be reversed so that he might receive such a proceeding.

We recognize the merits of Portillo-Ventura's two remaining issues are largely no longer ours to resolve given the decision to reverse his convictions. But because those claims involve matters which may occur again upon any retrial conducted below, we deem it appropriate to afford those issues some measure of discussion.

The first queries whether Portillo-Ventura's stipulation to an element of one of the crimes with which he was charged required the district court to obtain a jury trial waiver with respect to that element before accepting that stipulation?

The foundation for this argument is *State v. Johnson*, 310 Kan. 909, 453 P.3d 281 (2019). In that case, the State charged Johnson with criminal possession of a firearm, aggravated assault, and felony criminal discharge of a weapon. During trial, Johnson stipulated that he had a prior adjudication which prevented him from lawfully possessing the weapon, an element in the possession of a firearm charge. A jury ultimately convicted Johnson as charged. On appeal, a panel of this court rejected his contention that the district court erred in failing to obtain a jury trial waiver before accepting his stipulation. *State v. Johnson*, 53 Kan. App. 2d 734, 742, 391 P.3d 711 (Kan. App. 2017), *reversed* 310 Kan. 909, 453 P.3d 281 (2019). Johnson petitioned the Kansas Supreme Court for review and that court reversed upon finding that the district court erred when it accepted Johnson's elemental stipulation without first obtaining a knowing and voluntary jury trial waiver on the record. 310 Kan. at 919.

Two panels of this court have upheld similar stipulation arguments in accordance with *Johnson*. First, *State v. Lax*, No. 121,450, 2020 WL 7409957 (Kan. App. 2020) (unpublished opinion), involved a gang-related shooting. The State charged Lax with, among other things, criminal possession of a firearm. He stipulated that he was convicted of a felony within the past 10 years and that he was not found to be in possession of a firearm in that prior felony conviction. 2020 WL 7409957, at *7. The jury returned a guilty verdict for each of the charged offenses. On appeal, Lax argued and the State agreed that under *Johnson*, the district court erred by accepting his stipulation without first obtaining a jury trial waiver from him. 2020 WL 7409957, at *8. The panel concluded that because the district court did not advise Lax of his right to a jury trial on all the elements of criminal possession of firearm and did not properly obtain his personal waiver of that right related to the element for which he entered a stipulation, it violated

his fundamental right to a jury trial and, as a result, that conviction must be reversed. 2020 WL 7409957, at *8.

Second, in *State v. Ramos*, No. 122,657, 2021 WL 1826884 (Kan. App. 2021) (unpublished opinion), the State charged Ramos with criminal possession of a weapon by a convicted felon. The parties entered into a stipulation which informed the jury at trial that Ramos was not legally able to possess a firearm. The district court did not obtain a jury trial waiver from Ramos prior to acceptance of his stipulation. 2021 WL 1826884, at *1.

On appeal, Ramos, relying on *Johnson*, argued that the district court violated his right to a jury trial because it did not obtain a jury trial waiver from him before notifying the jury of the stipulation. 2021 WL 1826884, at *1. In reversing, the *Ramos* panel found there was no evidence to establish that Ramos was aware of the meaning of the stipulation or understood its consequences. He did not sign the stipulation, nor did he enter it into the record orally. Thus, the court reversed his conviction and remanded for further proceedings. 2021 WL 1826884, at *2.

As in *Johnson*, *Lax*, and *Ramos*, the district court here neglected to obtain a jury trial waiver from Portillo-Ventura prior to accepting a stipulation to his age. Though these cases all involved stipulations pertaining to criminal possession of a firearm charges, the language used in those opinions does not reflect that the rule is confined to those circumstances. See *Johnson*, 310 Kan. at 918-919; *Lax*, 2020 WL 7409957, at *7-8; *Ramos*, 2021 WL 1826884, at *1-2. We acknowledge that the Supreme Court issued its decision in *Johnson* on November 27, 2019, and therefore the district court did not have the benefit of that guidance during Portillo-Ventura's trial on September 30, 2019, and October 1, 2019. But going forward, to the extent that Portillo-Ventura opts to enter a stipulation once again for his age, the directive discussed in *Johnson* must be adhered to. "'[F]or a criminal defendant to effectively waive his right to a trial by jury, the defendant

21

must first be advised by the court of his right to a jury trial, and he must personally waive this in writing or in open court.'" *State v. Beaman*, 295 Kan. 853, 859, 286 P.3d 876 (2012) (quoting *State v. Irving*, 216 Kan. 588, 590, 533 P.2d 1225 [1975]).

The second issue warranting discussion given its potential for recurrence here is the sentencing court's decision to cross-count Portillo-Ventura's convictions in each of his two cases when calculating his criminal history score.

As stated above, 18 CR 130 and 18 CR 131 were joined for trial in this case. The sentencing court found that, in 18 CR 130, Portillo-Ventura had an "A" criminal history score. To make this calculation, the court included the three person felonies in 18 CR 131 as well as a previous misdemeanor. Similarly, the court found Portillo-Ventura had a "D" criminal history for 18 CR 131 by counting the person felony conviction in 18 CR 130. Portillo-Ventura and the State agree that error occurred in this "cross-counting" and that his case must be remanded for resentencing in those cases. We agree with their analysis.

The language of K.S.A. 2020 Supp. 21-6810 controls this issue. K.S.A. 2020 Supp. 21-6810(c) explains that "[e]xcept as otherwise provided, all convictions, whether sentenced consecutively or concurrently, shall be counted separately in the offender's criminal history." The term "prior conviction" is defined in K.S.A. 2020 Supp. 21-6810(a) as:

> "any conviction, other than another count in the current case, which was brought in the same information or complaint or which was joined for trial with other counts in the current case pursuant to K.S.A. 22-3203, and amendments thereto, which occurred prior to sentencing in the current case, regardless of whether the offense that led to the prior conviction occurred before or after the current offense or the conviction in the current case."

Thus, under the statute, when, as here, counts are charged separately, but tried together, they do not count as convictions for criminal history purposes. At the end of the new trial, if these cases are joined once again, they may not be counted against one another for establishing Portillo-Ventura's criminal history score.

Convictions reversed, sentence vacated, and case remanded for new trial.